

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00090-CR

———————————————

CARLOS CHAVEZ, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court No. F22-717-462

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Birdwell
Dissenting Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

Appellant Carlos Chavez appeals his conviction for continuous sexual abuse of a young child and indecency with a child. *See* Tex. Penal Code Ann. §§ 21.02, 21.11. In two issues, Chavez argues that the trial court reversibly erred by (1) violating his Sixth Amendment right to confrontation in refusing to admit evidence that the complainants' mother[1] applied for a U-Visa[2] "shortly after" the complainants' outcries and (2) admitting hearsay that did not fall under the outcry statute's exception. Because we conclude that the trial court did not violate Chavez's Sixth Amendment right and that the trial court did not err by allowing the complained-of testimony, we affirm the trial court's judgment of conviction.

---

[1]The complainants are Chavez and Mother's daughters, Shelly and Tonya. To protect the identity of the complainants, we refer to Shelly and Tonya by an alias and to their mother as Mother. *See* Tex. R. App. P. 9.8 cmt., 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[2]A U-Visa is "an immigrant permit for victims of violent crime." *Aguilar v. State*, No. 02-14-00119-CR, 2015 WL 1775634, at *1 (Tex. App.—Fort Worth Apr. 16, 2015, no pet.) (mem. op., not designated for publication). It authorizes the granting of nonimmigrant status to certain aliens or noncitizens who are not otherwise legally in the United States, allowing them to remain if they are the victims of crimes such as sexual assault, sexual abuse, and sexual exploitation, or the qualifying family members of such victims. *See* 8 U.S.C. §§ 1101(a)(15)(U)(ii), (iii), 1184(p).

# I. Background[3]

On September 7, 2020, fourteen-year-old Shelly told Mother that Chavez had sexually abused her by touching her vagina with both his penis and his hands. Mother and Shelly reported the abuse to the police that day. During a forensic interview, Shelly described additional acts of sexual abuse, including Chavez's inserting his fingers into her vagina, licking her vagina, touching her breasts, forcing her to touch his penis, and touching her vagina with his penis. Following the forensic interview, Shelly was examined by a sexual assault nurse examiner (SANE), to whom Shelly described a similar pattern of sexual abuse that had occurred over a period of years.

As part of the investigation into the allegations that Chavez had sexually assaulted Shelly, the forensic interviewer also spoke with seventeen-year-old Tonya, who did not initially disclose that she had been sexually abused by Chavez. However, sometime in October 2020, Tonya told Mother that Chavez had once touched Tonya's vagina, but she kicked him away. After this disclosure, Tonya was examined by a forensic interviewer and by a SANE. During both her second forensic interview and the SANE exam, Tonya described additional acts of sexual abuse and detailed where the acts had occurred, what she had been wearing, and how Chavez had touched her.

---

[3]Because Chavez does not challenge the sufficiency of the evidence to support his convictions, we omit a more detailed factual background and will set forth additional facts as necessary in our discussion of his issues.

Chavez was indicted on one count of continuous sexual abuse of a child, namely Shelly, and one count of indecency with a child, namely Tonya. At Chavez's jury trial, Shelly, Tonya, Mother, the forensic interviewer, and the SANEs testified about Chavez's acts of sexual abuse. The jury found him guilty of both counts and set his punishment at forty-five years' confinement on Shelly's case and ten years' confinement on Tonya's case. The trial court entered judgment on the jury's verdict and ordered the sentences to run consecutively. This appeal followed.

## II. Sixth Amendment Right to Confrontation

In his first issue, Chavez contends that, by refusing to admit evidence that Mother had applied for a U-Visa shortly after the complainants' outcries, the trial court violated Chavez's Sixth Amendment right to confrontation. In response, the State argues that the trial court was within its discretion to limit cross-examination and exclude the testimony because the excluded testimony was not relevant, but even if the trial court did err by excluding the testimony, the error was harmless beyond a reasonable doubt.

### A. Standard of Review

We review a trial court's exclusion of topics from cross-examination for an abuse of discretion, recognizing that a trial judge retains wide latitude to impose reasonable limits on cross-examination. *Arnold v. State*, No. 02-18-00022-CR, 2019 WL 165995, at *4 (Tex. App.—Fort Worth Jan. 10, 2019, pet. ref'd) (mem. op., not

4

designated for publication) (citing *Johnson v. State* (*Thaxton D. Johnson*), 433 S.W.3d 546, 555 (Tex. Crim. App. 2014)).

A trial court abuses its discretion when its decision "falls outside the zone of reasonable disagreement." *Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016). We will not reverse the trial court's decision to exclude evidence unless the ruling "was so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)). Nor will we reverse a ruling that is "correct under any applicable theory of law." *Johnson v. State* (*Joe Dale Johnson*), 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

## B. Applicable Law

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The main purpose of the Confrontation Clause is to secure for the opposing party the opportunity to cross-examine witnesses, as that is "the principal means by which the believability of a witness and the truth of his testimony are tested." *Joe Dale Johnson*, 490 S.W.3d at 909 (quoting *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974)).

As relevant in this case, a defendant's right to cross-examine a prosecution witness allows the defendant to attack the credibility of that witness or to establish the witness's bias or motive. *See Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009) (citing *Davis*, 415 U.S. at 316, 94 S. Ct. at 1110). Indeed, "it is not within a trial

5

court's discretion to prohibit a defendant from engaging in otherwise appropriate cross-examination" to show bias or motive on the part of that witness. *Thaxton D. Johnson*, 433 S.W.3d at 551 (internal quotation marks omitted) (quoting *Hurd v. State*, 725 S.W.2d 249, 252 (Tex. Crim. App. 1987)). However, "the right to cross-examine is not unqualified." *Joe Dale Johnson*, 490 S.W.3d at 909. A trial court may limit the scope and extent of cross-examination as long as such limitations do not infringe upon the Confrontation Clause's guarantee of "an opportunity for effective cross-examination." *Id.* (quoting *Thaxton D. Johnson*, 433 S.W.3d at 552). For example, the trial court may reasonably limit cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Irby v. State*, 327 S.W.3d 138, 145 (Tex. Crim. App. 2010) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986)).

A trial court violates the Confrontation Clause when it "cut[s] off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony." *Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435. But even in the context of the Confrontation Clause,

> an appellant's ability to conceive a hypothetical justification for the questions that he wants to ask on cross-examination does not deprive the trial court of the discretion to restrict cross-examination. The trial court has many justifications that it can rely on to restrict cross-

6

examination, and an appellant has no grounds to complain if he can still present a vital defense even with the restrictions in place.

*Austin v. State*, No. 02-18-00484-CR, 2019 WL 6205247, at *6 (Tex. App.—Fort Worth Nov. 21, 2019, pet. ref'd) (mem. op., not designated for publication). Indeed, "the scope of cross-examination is not unilaterally controlled by the defendant, and the trial court has the discretion to determine what level of examination will permit a defendant to muster the evidence needed to make a defensive argument." *Id.* at *9 (citing *Faglie v. State*, No. 03-17-00281-CR, 2019 WL 847812, at *4 (Tex. App.— Austin Feb. 22, 2019, pet. ref'd) (mem. op., not designated for publication)); *see Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435 (holding a defendant is entitled to only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish").

To be admissible—even in the face of a Confrontation Clause objection—the proffered testimony must still have some "causal" or "logical" connection to the alleged bias or motive. *Thaxton D. Johnson*, 433 S.W.3d at 552–53. The Court of Criminal Appeals has explained that the "causal connection" requirement "is ultimately rooted in the concept of relevance." *Id.* at 552. Thus, whether the proffered evidence is relevant is the first step in a trial court's decision to either admit or exclude the evidence:

> Even though our rules "favor the admission of all logically relevant evidence for the jury's consideration," the trial court judge is still in charge of making the threshold decision as to whether evidence is

relevant or not, and her decision will not be disturbed on appeal unless it is "clearly wrong."

*Henley*, 493 S.W.3d at 83 (footnotes omitted). The evidence must be both material and probative. *Id.*

In the context of a witness's credibility, relevance does not depend on whether the proffered evidence definitively proves the alleged bias. *Thaxton D. Johnson*, 433 S.W.3d at 552. Rather, "it need only 'make the existence' of bias 'more probable or less probable than it would be without the evidence.'" *Id.* (quoting Tex. R. Evid. 401). But "a defendant who cannot persuasively establish [some causal] connection has essentially failed to demonstrate that the evidence he seeks to introduce . . . is *relevant* to prove the allegation of bias." *Id.* (citing *Carpenter v. State*, 979 S.W.2d 633, 635 (Tex. Crim. App. 1998)). For example, a witness who may "be on probation, have pending charges, be in the country illegally, or have some other 'vulnerable status' [is not] automatically subject to cross-examination with that status." *Irby*, 327 S.W.3d at 152. The cross-examiner is still required to show the relevance of the "vulnerable status" or any other alleged bias of that witness. *Id.* at 151–52; *see Henley*, 493 S.W.3d at 83 ("A defendant does not have an unfettered right to present evidence that has no relevance.").

8

## C. The Excluded Evidence

Before trial, the State moved in limine to preclude any testimony about Mother's immigration status. The trial court ordered defense counsel to "approach on anything dealing with immigration."

During a hearing outside the presence of the jury, Chavez attempted to ask Mother about her immigration status and her U-Visa application, arguing that she was requesting citizenship status "[b]ecause of this case."[4] According to Chavez, Mother, Shelly, and Tonya had fabricated the allegations against him so that Mother could apply for a U-Visa and stay in the United States. The trial court did not allow the testimony before the jury because of the "timing" or lack of dates that would render the testimony relevant.

The trial court then allowed Chavez to cross-examine Mother about her U-Visa application outside the presence of the jury. Mother testified that she learned that a U-Visa "existed" at some unspecified time before Shelly's outcry on September 7, 2020, when a colleague had applied for a U-Visa. It is unclear from the record exactly when

---

[4]"One requirement for obtaining a U-Visa is that a complainant 'must assist law enforcement in the investigation or prosecution of the crime.'" *Pabon v. State*, No. 02-18-00517-CR, 2019 WL 4122611, at *2 n.2 (Tex. App.—Fort Worth Aug. 29, 2019, no pet.) (mem. op., not designated for publication) (quoting Diane Mickelson, Comment, *When the Problem is the Solution: Evaluating the Intersection Between the U[-]Visa "Helpfulness" Requirement and No-Drop Prosecution Policies*, 53 U. Rich. L. Rev. 1455, 1465 (2019)). Given the nonimmigrant status that a U-Visa grants to the victims of crime in support of the investigation or prosecution of the crime, evidence of a complainant's efforts to obtain a U-Visa may be admissible to show bias or prejudice. *See id.*

Mother first heard about a U-Visa or how long before the outcries that may have been.

In November 2020—after Shelly's and Tonya's outcries—someone from the Children's Advocacy Center (CAC) spoke to Mother about applying for a U-Visa. Then in December 2020, Mother began applying for a U-Visa. The application was "based on the sexual misconduct that [Shelly and Tonya] ha[d] alleged." Mother did not hire an attorney to assist with the application, and at the time of Chavez's trial in May 2022, the status of Mother's U-Visa application was unknown.

When asked to explain what a U-Visa was, Mother testified that it was "something with domestic violence" and that it could be used to "get some sort of legal status" in the United States. She further testified that she did not have "any interest in staying" in the United States but that she did not want to leave Shelly and Tonya alone. She denied that she had fabricated the allegations against Chavez to obtain citizenship status.

Chavez argued that the evidence was "part of" the Confrontation Clause because it went to show motive for fabricating the allegations against him. The State responded that Chavez could not link the evidence to any motive and argued that the evidence was substantially more prejudicial than probative. *See* Tex. R. Evid. 403.

The trial court did not allow the testimony before the jury. It concluded that, based on the "timing" of the outcries and the fact that the CAC "is the one" that told Mother she could file a U-Visa application—after Shelly's and Tonya's outcries and

10

after they reported the sexual abuse—the evidence of Mother's immigration status and U-Visa application was not relevant.

**D. Analysis**

To be admissible, the evidence of Mother's immigration status and U-Visa application would have had to be relevant. *See* Tex. R. Evid. 401, 402; *Henley*, 493 S.W.3d at 83. To establish relevance, Chavez was required to show that Mother's immigration status and U-Visa application were logically connected to her alleged bias or motive to lie. *See Henley*, 493 S.W.3d at 95; *Thaxton D. Johnson*, 433 S.W.3d at 552; *Irby*, 327 S.W.3d at 145; *Pabon*, 2019 WL 4122611, at *4; *Garcia v. State*, No. 13-17-00218-CR, 2019 WL 1388532, at *6 (Tex. App.—Corpus Christi–Edinburg, Mar. 28, 2019, pet. ref'd) (mem. op., not designated for publication) ("The witness's immigration status is relevant if it is logically connected to a motive to lie."); *Sansom v. State*, 292 S.W.3d 112, 121 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (mem. op.). In other words, Chavez needed to show the trial court enough evidence of an alleged bias to make the excluded evidence relevant.

We conclude that the evidence of Mother's U-Visa application cannot meet the "causal connection" requirement. The timing of the outcries, in part, controls the admissibility of the evidence. *See Pabon*, 2019 WL 4122611, at *4. Specifically, the record does not support Chavez's assertion that at the time of Shelly's and Tonya's outcries, Mother had a bias or motive to falsely accuse Chavez of sexually abusing Shelly and Tonya.

11

In *Joe Dale Johnson*, which Chavez cites as support in his appellate brief, the trial court excluded evidence that the complainant in an aggravated sexual assault case was in counseling at the time of his outcry due to having been accused of sexually abusing his sister. 490 S.W.3d at 903. The defendant sought to introduce the evidence to demonstrate the complainant's mental state at the time of his outcry and to show his motive for fabricating the allegations against the defendant. *Id.* at 903–04. Although the trial court excluded the evidence, it still allowed the State to present extraneous offense evidence that the defendant had "committed a similar sexual assault several years earlier . . . to rebut the defensive theory of fabrication and retaliation." *Id.* at 915. The Court of Criminal Appeals held that the trial court abused its discretion in excluding the evidence because, among other reasons, it related to the complainant's motive to fabricate the accusation and was constitutionally required to be admitted under the Confrontation Clause. *Id.* at 913. The court specifically noted that the testimony related to the complainant's motive to accuse "*at the time of his outcry*," referring to the fact that, at the time of his outcry, he was in counseling for sexually abusing his sister. *Id.* at 912.

Here, the evidence does not support Chavez's assertion that Mother knew enough about U-Visas at the time of Shelly's and Tonya's outcries to develop a bias or motive to lie. Rather, the record indicates that Mother did not know what a U-Visa was or how it could potentially benefit her until after the outcries and her subsequent conversation with the CAC. At trial, Mother testified outside the presence of the jury

12

that at some undeterminable time before Shelly's outcry, she had heard about U-Visas from a colleague. But the trial court had no way of knowing the circumstances surrounding the colleague's U-Visa application or whether they were similar to Mother's situation. Specifically, there is no indication that Mother had known, before the outcries, that a U-Visa application was an option in child sexual abuse cases. Nor was there any indication that she had known it was available for both the victims of sexual abuse and the victims' families.

When asked to explain what a U-Visa was, Mother testified that it was "something with domestic violence" and that it could be used to "get some sort of legal status." While Mother knew *at the time of trial* that a U-Visa had "something [to do] with domestic violence," there is no evidence that, before Shelly's and Tonya's outcries, she knew anything about a U-Visa beyond its existence. Without more, the evidence does not show that Mother knew what a U-Visa was or that it was applicable to her under the circumstances at any time before her conversation with the CAC—months after the outcries.

We agree with the State's observation that, for Chavez's assertion to be plausible, Shelly and Tonya would have had to be "in on" the alleged plot against Chavez. Mother is not the complainant in this case—a fact that Chavez appears to overlook. *Cf. id.* at 910 ("In a case such as this, where the believability of the *complainant* forms the foundation of the State's case, Texas law favors the admissibility of evidence that is relevant to the complainant's bias, motive, or interest to testify in a

13

particular fashion." (emphasis added)). Consequently, to establish a causal connection between the U-Visa-application testimony and *Mother's* alleged bias or motive to lie, the evidence would have to show that Shelly and Tonya—the complainants—had the same bias or motive, as Mother obviously could not have fabricated the sexual-abuse allegations against Chavez without Shelly's and Tonya's help. In other words, Chavez's theory of admissibility is based on the following hypothetical assertion:

- Mother was apparently at risk for deportation and wanted to stay in the United States;

- Prior to Shelly's and Tonya's outcries, Mother knew that a U-Visa offered legal protection from deportation to family members of child-sexual-abuse victims;

- Mother concocted a plan to obtain a U-Visa by falsely accusing Chavez of sexually abusing Shelly and Tonya;

- Mother then went to Shelly and Tonya and told them her plan to falsely accuse Chavez of sexual abuse;

- Both Shelly and Tonya either voluntarily agreed to participate or were coerced by Mother into participating in the plan—despite the fact that it could send their father to prison;

14

- Mother, Shelly, and/or Tonya then created false, detailed accusations of sexual abuse against Chavez, including where, when, and how specific sexual acts had occurred over a period of several years;

- Mother, Shelly, and Tonya then reported the false accusations to the police as if they were legitimate acts of sexual abuse committed by Chavez;

- Shelly and Tonya later repeated the same false, detailed accusations of sexual abuse—with no irregularities—to the SANEs and to the forensic interviewer;

- Mother then sufficiently assisted in the investigation or prosecution of Chavez to qualify for a U-Visa, *see* 8 C.F.R. § 214.14(a)(12), (b)(3), (h)(2)(i)(A); and

- Mother, Shelly, and Tonya were all able to testify about the false accusations of sexual abuse—in detail—almost two years later at Chavez's trial.

The record does not support Chavez's hypothetical assertion.

There is no indication that Mother had been at risk for deportation. Mother had been living in the United States for at least twelve years prior to Shelly's and Tonya's outcries, and there is no evidence in the record that Mother was ever at risk for deportation at any other time that she had been living in the United States. *See Garcia*, 2019 WL 1388532, at *6; *cf. Sansom*, 292 S.W.3d at 119, 120 (concluding there was evidence that the complainants' mother, who had been married to and testified against the appellant, would be deported if the appellant divorced her and that the complainants' mother fabricated the allegations in retaliation).

15

Additionally, the record does not indicate that Shelly and Tonya had been coached—by Mother or anyone else—to lie about being sexually abused. On the contrary, the evidence showed that Shelly was hesitant to come forward about the sexual abuse because she did not want her father to go to jail, that Tonya waited to report the sexual abuse even after Shelly's outcry, and that Mother was not the first person to whom either Shelly or Tonya had disclosed the sexual abuse.[5] Tonya testified that Mother had not pressured her into making up a story, and Shelly testified that Mother had never told her to say something that she knew was wrong, that no one had told her what to say, that she was not making up the accusations, and that she was telling the truth.

During the hearing outside the presence of the jury, Chavez's counsel did not question Mother or otherwise demonstrate that Shelly and Tonya knew anything about Mother's alleged risk for deportation, about U-Visas, or about Mother's U-Visa application. There is no evidence in the record that Shelly or Tonya knew, either at the time of their outcries or at the time of trial, what a U-Visa was, that U-Visas even existed, that Mother could apply for a U-Visa, that a U-Visa could affect Mother's immigration status, or that Mother eventually applied for a U-Visa. The evidence

---

[5]Shelly testified that at least a month before she told Mother about the sexual abuse, she had told her adult cousin in Mexico. Tonya testified that when she was approximately sixteen years old, she told her boyfriend—also a minor—about what had happened with Chavez when she was younger.

simply does not show that Mother, Shelly, and Tonya had conspired or otherwise fabricated sexual-abuse accusations against Chavez.

We conclude that Chavez failed to establish a causal connection or logical relationship between the evidence of Mother's U-Visa application and her alleged bias or motive to lie. *See Pabon*, 2019 WL 4122611, at *4 (citing *Thaxton D. Johnson*, 433 S.W.3d at 552); *Garcia*, 2019 WL 1388532, at *6 ("[Defendant's] assertion that the family plotted against him so that [the complainant's] father could obtain a U[-V]isa is not supported by any evidence and only supported by his hypothetical assertion."). Indeed, he failed to show the trial court enough evidence of an alleged bias that would make the excluded testimony relevant. *See Pabon*, 2019 WL 4122611, at *4 (holding the trial court did not abuse its discretion by excluding evidence of the *complainant's* U-Visa status because the defendant presented no evidence of a "logical connection" between her receipt of the U-Visa and her cooperation in his prosecution, since her cooperation occurred many years after she received her U-Visa). Accordingly, although the trial court "*entirely* foreclose[d]" the defense from cross-examining Mother about her U-Visa application, *see Thaxton D. Johnson*, 433 S.W.3d at 555–56, we hold that the evidence was not admissible—not even by a Confrontation Clause standard, *see Van Arsdall,* 475 U.S. at 679, 106 S. Ct. at 1435—and it was within the trial court's discretion to exclude the evidence.

We overrule Chavez's first issue.

17

### III. Outcry Witness Testimony

In his second issue, Chavez contends that the trial court erroneously admitted hearsay that did not fall under the outcry statute's exception and that the error affected his substantial rights. Specifically, Chavez argues that Mother was the proper outcry witness and that the forensic interviewer's testimony was inadmissible because she was not the first adult to whom Shelly and Tonya specifically outcried.

In response, the State asserts that both Mother and the forensic interviewer were proper outcry witnesses because the outcry statute is event specific, and here, there were clearly separated incidents of sexual abuse that Shelly and Tonya had disclosed only to the forensic interviewer. To the extent that there was any overlap in the testimonies, the State contends that any resulting error is harmless.

#### A. Standard of Review

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Montgomery v. State*, 810 S.W.2d 372, 379 (Tex. Crim. App. 1990). Trial courts have "broad discretion" when determining what witnesses qualify as outcry witnesses. *Garcia v. State*, 792 S.W.2d 88, 92 (Tex. Crim. App. 1990); *see Venancio v. State*, Nos. 02-21-00147-CR, 02-21-00148-CR, 2022 WL 17687436, at *3 (Tex. App.—Fort Worth Dec. 15, 2022, no pet.) (mem. op., not designated for publication); *Rodgers v. State*, 442 S.W.3d 547, 552 (Tex. App.—Dallas 2014, pet. ref'd); *Foreman v. State*, 995 S.W.2d 854, 859 (Tex. App.—Austin 1999, pet. ref'd) (noting that prior cases "establish the

difficulty that can arise in identifying the proper outcry witness, and the broad discretion of district courts in making this determination"). We will not reverse a trial court's decision to admit or exclude the evidence unless the record shows a clear abuse of discretion. *Zuliani*, 97 S.W.3d at 595. An abuse of discretion occurs only when the trial court's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Id.*

Any error in admitting the evidence is nonconstitutional error. *See Holley v. State*, No. 02-20-00051-CR, 2021 WL 1918769, at *2 (Tex. App.—Fort Worth May 13, 2021, no pet.) (mem. op., not designated for publication) (citing Tex. R. App. P. 44.2(b)). We must disregard any nonconstitutional errors that do not affect the appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). An error that has a "substantial and injurious effect or influence in determining the jury's verdict" affects a substantial right. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In determining the likelihood that a nonconstitutional error adversely affected the jury's decision, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the

character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

## B. Applicable Law

Article 38.072 of the Texas Code of Criminal Procedure creates a statutory exception to the general rule excluding hearsay. Tex. Code Crim. Proc. Ann. art. 38.072, § 2(b). As the Court of Criminal Appeals has explained,

> Because it is often traumatic for children to testify in a courtroom setting, especially about sexual offenses committed against them, the Legislature enacted Article 38.072 to admit the testimony of the first adult a child confides in regarding the abuse. This witness may recite the child's out-of-court statements concerning the offense, and that testimony is substantive evidence of the crime.

*Martinez v. State*, 178 S.W.3d 806, 810–11 (Tex. Crim. App. 2005) (footnote omitted). The proper outcry witness is the "first person, 18 years of age or older, other than the defendant, to whom the child . . . made a statement about the offense or extraneous crime, wrong, or act." Tex. Code Crim. Proc. Ann. art. 38.072, § 2(a)(3). The Court of Criminal Appeals has construed the phrase "about the offense" to mean a statement that "in some discernible manner describes the alleged offense." *Garcia*, 792 S.W.2d at 91. "[T]he statement must be more than . . . a general allusion" of sexual abuse. *Id.* Thus, the proper outcry witness is not necessarily the first adult to whom the child revealed the abuse but, rather, the first adult to whom the child revealed specific details concerning the offense. *Id.*; *Thomas v. State*, 309 S.W.3d 576, 579 (Tex. App.— Houston [14th Dist.] 2010, pet. ref'd) (affirming trial court's determination that

20

stepmother was proper outcry witness despite victim's prior report of abuse to mother because initial report to mother lacked specificity).

As the statute is event specific, there may be more than one outcry witness, provided that each testifies about different events. *See Campos v. State*, No. 02-19-00122-CR, 2020 WL 3455901, at *3 (Tex. App.—Fort Worth June 25, 2020, pet. ref'd) (mem. op., not designated for publication); *Brown v. State*, 381 S.W.3d 565, 571 (Tex. App.—Eastland 2012, no pet.); *Hernandez v. State*, No. 02-08-00478-CR, 2010 WL 1854150, at *3 (Tex. App.—Fort Worth May 6, 2010, no pet.) (mem. op., not designated for publication). For example, in *Josey v. State*, our sister court in Texarkana held that the trial court did not abuse its discretion by admitting the testimony of a second outcry witness. 97 S.W.3d 687, 693 (Tex. App.—Texarkana 2003, no pet.). The victim first told his mother about being forced to have oral contact with the defendant's genitals and about being "fingered." *Id.* While the victim went into explicit detail with his mother about the act of oral contact, he gave no details about being "fingered." *Id.* Two days later, however, the victim provided, for the first time, details about being "fingered" during an interview with a forensic interviewer. *Id.* The court of appeals concluded the victim's first outcry regarding digital penetration did not occur until the interview. *Id.*; *cf. Schuster v. State*, 852 S.W.2d 766, 768 (Tex. App.—Fort Worth 1993, pet. ref'd) (holding psychologist was proper outcry witness even though complainant told mother first because no details were provided to mother).

## C. The Outcry Testimony[6]

Before Mother's and the forensic interviewer's respective testimonies, the trial court conducted a hearing outside the presence of the jury. Over Chavez's objections,[7] the trial court allowed both Mother and the forensic interviewer to testify about Shelly's and Tonya's prior disclosures of sexual abuse.

### 1. Shelly's Outcries

As to Shelly's outcries, Mother testified (1) that Chavez touched Shelly's private parts, indicating her vagina, with his hands, (2) that Chavez touched Shelly's vagina with his penis and put his penis in her vagina several times, which started as only part of his penis and increased "little by little," and (3) that at the first Lewisville apartment,[8] Chavez "laid [Shelly] down in the living room and abused her," though

---

[6]To provide context, the trial court's determination in this case was more complicated than most because Mother testified through an interpreter, which led to a situation in which questions had to be repeated and Mother's responses required clarification. In such circumstances, the trial court's determination of this issue is generally not one that falls outside the zone of reasonable disagreement. *See Campos*, 2020 WL 3455901, at *3.

[7]At trial, Chavez argued that neither Mother nor the forensic interviewer was the proper outcry witness as to Shelly because the first adult to whom she outcried was her cousin in Mexico. On appeal, Chavez concedes that Mother was the proper outcry witness as to both Shelly and Tonya and argues that only the forensic interviewer's outcry testimony was inadmissible hearsay.

[8]Mother, Shelly, and Tonya had lived in three different apartments in Lewisville. They lived at the first Lewisville apartment for approximately twelve years, then the second Lewisville apartment for approximately one year, and then the third Lewisville apartment for approximately one year until they moved to Garland at the time of Shelly's outcry.

Shelly did not tell Mother how he had abused her. Mother testified that Shelly did not describe all the times that Chavez had touched her. The forensic interviewer testified to the following incidents:

(1) Chavez locked himself and Shelly in her bedroom at the second Lewisville apartment and put his fingers inside of her vagina;

(2) Chavez locked himself and Shelly in her bedroom at the second Lewisville apartment and licked her vagina;

(3) Chavez grabbed Shelly's breasts;

(4) Chavez made Shelly stroke his penis eight to ten times, and sperm would come out of his penis onto her leg;

(5) When Shelly was twelve years old, Chavez touched her vagina with his penis when she was sleeping in Mother's room. Mother was showering at the time, and Shelly pushed Chavez away with her feet;

(6) When Shelly was thirteen years old, she was lying on the living room floor at the second Lewisville apartment when Chavez tried to put his penis inside of her. Shelly described this incident as the "worst time"; and

(7) When Shelly was in seventh grade, Chavez put his penis in her vagina and sperm came out. During this incident, Shelly was on the bottom bunk bed in the bedroom she shared with her sister at the second Lewisville apartment.

Only the forensic interviewer testified about some acts. For example, only the forensic interviewer testified that Shelly had disclosed Chavez's acts of licking Shelly's vagina, touching Shelly's breasts, and making Shelly touch his penis eight to ten times, and only the forensic interviewer referenced events in which Shelly described Chavez's semen. Mother did not testify about these events. The trial court therefore did not abuse its discretion by permitting the forensic interviewer to testify to these

23

acts. *See* Tex. Code Crim. Proc. Ann. art. 38.072; *Campos*, 2020 WL 3455901, at *7; *Brown*, 381 S.W.3d at 571; *Hernandez*, 2010 WL 1854150, at *3; *Josey*, 97 S.W.3d at 693.

To the extent that Mother's and the forensic interviewer's testimonies described sexual abuse involving similar acts, we agree with the State that the record indicates that these acts are separate and distinguishable. For example, both Mother and the forensic interviewer testified that Chavez had touched Shelly's vagina with his hands. During Shelly's testimony, she described times when Chavez would use his hands to touch her vagina both over her clothes and under her clothes, and she testified that when she was in seventh grade, he put his fingers in her vagina when she was in her bedroom. It reasonably follows from the record as a whole that the acts described by Mother and the forensic interviewer can reasonably be linked to separate events, which are distinguishable acts and offenses under the Penal Code. *See* Tex. Penal Code Ann. §§ 21.11(a)(1) (indecency with a child), 22.021(a)(1)(B)(i) (aggravated sexual assault).

Similarly, both Mother and the forensic interviewer described acts involving penis-to-vagina contact and penetration. However, Mother testified that Shelly did not describe each time Chavez's penis touched her vagina. The SANE's testimony revealed that Shelly had disclosed that Chavez would put his penis in her vagina when she was twelve or thirteen years old, that he would "put it in halfway" and she would push it out, and that he did this several times over about four years. These acts are similar to the specific penis-to-vagina acts described by Mother, but the forensic

24

interviewer did not testify to these acts. Rather, the forensic interviewer testified to an incident in which Chavez touched Shelly's vagina with his penis in Mother's bedroom while Shelly was sleeping and Mother was in the shower. Additionally, Shelly's testimony described the penis-to-vagina contact that occurred on the bottom bunk of the room she shared with her sister, which had not been described by Mother. The trial court was within the zone of reasonable disagreement to find that Mother's and the forensic interviewer's testimonies describing penis-to-vagina contact and penetration related to separate distinct events.

To the extent that Mother's and the forensic interviewer's testimonies did overlap, the overlap would be minimal, and we do not think that the error, if any, had more than a slight effect on the jury, particularly when the same evidence came in through other testimony without any objection from Chavez. *See Petty v. State*, No. 02-21-00130-CR, 2022 WL 4545532, at *7 (Tex. App.—Fort Worth Sept. 29, 2022, pet. ref'd) (mem. op., not designated for publication) ("[C]umulative testimony from an outcry witness is harmless when the child victim also testifies about the abuse."); *Holley*, 2021 WL 1918769, at *7 (finding outcry witnesses' testimonies about the same occurrence had no more than a slight effect on the jury and overruling appellant's issue); *McLemore v. State*, No. 02-15-00229-CR, 2016 WL 4395778, at *9 (Tex. App.—Fort Worth Aug. 18, 2016, pet. ref'd) (mem. op., not designated for publication) ("Texas courts have repeatedly held that testimony about a child's statements

25

concerning a sexual crime is harmless when other, unobjected-to evidence proves the same facts."). We overrule Chavez's second issue at to Shelly's outcries.

## 2. Tonya's Outcries

As to Tonya's outcries, Mother testified that Tonya had disclosed to her that one day when Mother was in the bathroom showering and Tonya was sleeping, Chavez pulled Tonya's underwear down and touched her private parts, indicating her vagina, with his hands. Tonya then became angry and kicked Chavez. The forensic interviewer testified to the following incidents:

(1) Tonya and Chavez were lying on the bed watching the FIFA World Cup when Chavez put his hand underneath her underwear and on her vagina;

(2) Tonya was lying on a twin bunk bed in a black bra and black underwear when Chavez came in, and she woke up feeling someone touching her vagina and tugging on her underwear; and

(3) Tonya was lying down asleep on the edge of the bed in the master bedroom and woke up when she felt someone touching her vagina. Chavez was standing to the side of the bed holding a flashlight, pulling her panties to the side, and touching the lips of her vagina with his hand. She could not remember what happened afterwards, but she remembered that Mother was still in the shower.

Mother's and the forensic interviewer's testimonies described separate events. For example, only the forensic interviewer testified that Tonya had disclosed Chavez's acts of putting his hand on her vagina while they were watching the FIFA World Cup and touching her vagina when she was lying on a twin bed wearing a black bra and underwear. Mother did not testify about these events but did testify to Tonya's disclosure that Chavez had pulled her underwear down and touched her vagina when

26

she was sleeping and Mother was in the shower. The trial court therefore did not abuse its discretion by permitting the forensic interviewer to testify to these acts. *See* Tex. Code Crim. Proc. Ann. art. 38.072, § 1(1); *Campos*, 2020 WL 3455901, at *7; *Brown*, 381 S.W.3d at 571; *Hernandez*, 2010 WL 1854150, at *3; *Josey*, 97 S.W.3d at 693.

To the extent that Mother's and the forensic interviewer's testimonies described separate incidents of sexual abuse involving similar acts, we agree with the State that the record indicates that these acts are distinguishable. For example, both Mother and the forensic interviewer testified that Chavez had touched Tonya's vagina when she was sleeping and Mother was in the shower. The State provided the SANE report as evidence in which Tonya disclosed that Chavez had touched her vagina with his hands but did not put his fingers inside. Tonya stated that he had done this "maybe five times, sometimes under a blanket when [Mother] was showering or sleeping." It reasonably follows from the record as a whole that Chavez touched Tonya's vagina while she was sleeping and Mother was showering on more than one occasion, particularly when Tonya provided different details for each disclosure, i.e., she told Mother that she had been angry and kicked Chavez, and she told the forensic interviewer that Chavez had used a flashlight to look at her vagina. Thus, the acts described by Mother and the forensic interviewer can reasonably be linked to separate events, and the trial court was within the zone of reasonable disagreement to allow the forensic interviewer to testify.

27

To the extent that Mother's and the forensic interviewer's testimonies did overlap, the overlap would be minimal, and we do not think that the error, if any, had more than a slight effect on the jury, particularly when the same facts came in through other evidence without any objection from Chavez. *See Petty*, 2022 WL 4545532, at *7; *Holley*, 2021 WL 1918769, at *7; *McLemore*, 2016 WL 4395778, at *9. We overrule Chavez's second issue as to Tonya's outcries.

## IV. Conclusion

Having overruled both of Chavez's issues, we affirm the trial court's judgment of conviction.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: November 9, 2023